UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHELSEA VENTURES, LLC,

    Plaintiff,                                          Case No. 20-13002

vs.                                                     HON. MARK A. GOLDSMITH

CINCINNATI INSURANCE COMPANY,

    Defendant.
_____/

**OPINION & ORDER
GRANTING DEFENDANT'S MOTION TO DISMISS (Dkt. 15) AND
GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL
AUTHORITY (Dkt. 25)**

This matter is before the Court on Defendant Cincinnati Insurance Company's motion to dismiss (Dkt. 15) and its motion for leave to file supplemental authority (Dkt. 25). The motion to dismiss has been fully briefed, and no opposition to the motion for leave to file supplemental authority was filed. Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons discussed below, the Court grants Cincinnati's motion to dismiss and its motion for leave to file supplemental authority.

### I. BACKGROUND

This action involves Cincinnati's denial of property insurance coverage for financial losses allegedly sustained by Plaintiff Chelsea Ventures LLC during the COVID-19 pandemic. Chelsea is an owner and operator of a restaurant that was forced to suspend or reduce its operations pursuant to civil orders enacted to stem the spread of COVID-19. Second Amended Complaint (SAC) ¶¶ 8, 12, 15 (Dkt. 13). Beginning in March 2020, Michigan's governor and the Michigan Department

of Health and Human Services (DHHS) issued a series of civil orders that either closed restaurants to on-site dining or significantly restricted restaurants' on-site dining capacities. Id. ¶¶ 65–71. Government directives also required essential businesses such as restaurants to increase the frequency of cleaning, reduce hours, install new protective barriers, and provide personal protective equipment to employees. Id. ¶ 70. Additionally, the Governor issued an executive "Stay Home Stay Safe" order temporarily requiring Michigan residents to remain at home except as necessary to perform essential activities such as purchasing groceries, take-out food, medical supplies, or other necessary items. Id. ¶ 65. As a result of COVID-19 and these civil orders, Chelsea suspended or reduced its operations, causing it to sustain substantial financial losses. Id. ¶¶ 73–74.

For the period between November 1, 2019, and November 20, 2020, Chelsea maintained a commercial property insurance policy with Cincinnati. Id. ¶ 11. The policy covered loss of business income and extra expenses incurred as a result of a suspension of business operations under circumstances delineated in the policy. Id.; see also Policy at PageID.1983–1984 (Dkt. 15-1). Chelsea submitted a timely claim to Cincinnati requesting payment of insurance benefits for its financial losses, and on September 30, 2020, Cincinnati denied coverage. Id. ¶¶ 89–90. In its denial letter, Cincinnati maintained that coverage was unavailable under the business income, extra expense, and civil authority provisions of the policy because Chelsea did not sustain direct physical loss to its property. Denial Letter at 1, 3, 7 (Dkt. 13-1).

In its complaint, Chelsea asserts claims for declaratory and injunctive relief and for breach of contract under the policy's business income, extra expense, and civil authority provisions (Counts I–VI). Additionally, Chelsea asserts claims for appraisal (Count VII) and violation of the Michigan Uniform Trade Practices Act, Mich. Comp. Laws § 500.2001, et seq. (Count VIII)

stemming from Cincinnati's allegedly improper denial of its insurance claim. In its motion, Cincinnati maintains that all claims must be dismissed because Chelsea has not plausibly alleged that it sustained a direct physical loss, as required under the policy. Mot. to Dismiss (MTD) at 1 (Dkt. 15).

## II. STANDARD OF DECISION

On a motion to dismiss pursuant to Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555–556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. A complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice. Id. at 678. However, a complaint need not contain "detailed factual allegations." Twombly, 550 U.S. at 555. Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote. Id. at 556. Accordingly, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Directv, 487 F.3d at 476.

## III. ANALYSIS

The parties agree that Michigan law governs the present dispute. See MTD at 8; Resp. at 10 (Dkt. 18). The Michigan Supreme Court has held that "insurance policies are subject to the same contract construction principles that apply to any other species of contract." Rory v. Continental Ins. Co., 703 N.W.2d 23, 26 (Mich. 2005). The Michigan Court of Appeals has further elaborated on this point:

> The rules of contract interpretation apply to the interpretation of insurance contracts. The language of insurance contracts should be read as a whole and must be construed to give effect to every word, clause, and phrase. When the policy language is clear, a court must enforce the specific language of the contract. However, if an ambiguity exists, it should be construed against the insurer. An insurance contract is ambiguous if its provisions are subject to more than one meaning. An insurance contract is not ambiguous merely because a term is not defined in the contract. Any terms not defined in the contract should be given their plain and ordinary meaning, which may be determined by consulting dictionaries.

McGrath v. Allstate Ins. Co., 802 N.W.2d 619, 621–622 (Mich. Ct. App. 2010) (citation omitted). The proper interpretation of a contract is a question of law, as is the question of whether the contract is ambiguous. Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 780 (Mich. 2003).

The relevant policy provisions at issue in this case can be found in Cincinnati's Building and Personal Property Coverage Form and the Business Income (and Extra Expense) Coverage Form. Policy at PageID.1966, 2041.[1] The parties dispute the interpretation of the business income and extra expense provisions, as well as the civil authority provision. The Court confronts each of these provisions in turn.

---

[1] Because both forms contain substantially identical language, the Court will refer to the Building and Personal Property Coverage Form.

## A. Business Income and Extra Expense

The policy provides coverage for certain lost business income:

> We will pay for the actual loss of "Business Income" . . . you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by <u>direct "loss" to property</u> at a "premises" caused by or resulting from any Covered Cause of Loss.

Policy at PageID.1983 (emphasis added).[2] The policy also provides coverage for extra expenses:

> We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain . . . during the "period of restoration" that you would not have sustained <u>if there had been no direct "loss" to property</u> caused by or resulting from a Covered Cause of Loss.

Id. at PageID.1984 (emphasis added). As relevant to the present action, the policy defines a "covered cause of loss" as a "direct 'loss' unless the 'loss' is excluded or limited in in this Coverage Part." Id. at PageID.1970. A "loss," in turn, is defined as "accidental physical loss or accidental physical damage." Id. at PageID.2003.

Courts interpreting identical policy language have found that coverage for business income and extra expense is contingent on an insured sustaining direct physical loss or damage, a premise the parties do not dispute. See, e.g., Brown Jug, Inc. v. Cincinnati Ins. Co., No. 20-CV-13003, 2021 WL 2163604, at *2–4 (E.D. Mich. May 27, 2021); St. Julian Wine Co., Inc. v. Cincinnati Ins. Co., No. 1:20-cv-374, 2021 WL 1049875, at *1 (W.D. Mich. Mar. 19, 2021). However, the

---

[2] In deciding a Rule 12(b)(6) motion, courts are generally confined to considering the allegations in the complaint, matters of public record, orders, the record of the case, and exhibits attached to the complaint. Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001). Additionally, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997). Because the policy is referenced extensively in the complaint and is central to Chelsea's claims, the Court is permitted to consider it in connection with Cincinnati's motion. Likewise, the Court may consider the civil orders issued by the Governor and DHHS as matters of public record.

parties dispute whether Chelsea has plausibly alleged harm that qualifies as "physical" loss or damage.

Chelsea alleges that it sustained direct physical loss or damage to its property due to the presence of COVID-19 at the premises and the restrictions imposed under the civil orders. SAC ¶¶ 62–64, 96. The parties, however, differ in their interpretations of the requirement that loss or damage to property be "physical." According to Cincinnati, "physical loss" or "physical damage" requires tangible, concrete destruction of or alteration to property. MTD at 8. Citing a multitude of recent cases holding that similar policies provide no coverage for income lost during pandemic-related business closures, Cincinnati maintains that neither COVID-19 nor the civil orders caused tangible harm to Chelsea's property. Id. at 8–11. Chelsea, by contrast, argues that "physical loss" is broad enough to encompass an inability to use or possess property. Resp. at 13. It cites several cases adopting this interpretation and finding that similar insurance policies cover income lost during pandemic-related business closures. Id. at 13–16.

Noting the lack of Michigan authority interpreting the phrases "physical loss" or "physical damage," the Sixth Circuit has recognized the existence of out-of-state authorities supporting both Chelsea's and Cincinnati's competing interpretations. See Universal Image Prods., Inc. v. Fed. Ins. Co., 475 F. App'x 569, 573–574 (6th Cir. 2012). Although the Sixth Circuit speculated that Michigan courts may favor the narrower interpretation requiring tangible or concrete harm, it did not conclusively resolve which interpretation Michigan courts would adopt since the plaintiff in that case could not prevail under either interpretation. Id. at 573, 574 n.9. Likewise, this Court evaluates each of these interpretations and determines that Chelsea has failed to plausibly allege physical loss or damage under either view.

6

1. **Tangible Harm**

According to a leading treatise on insurance law, policy language requiring that loss or damage be "physical" is "widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." Steven Plitt, et al., 10A Couch on Ins. § 148:46 (3d ed. 1998). Thus, for example, where a business suspended its operations due to mold and bacteria contamination but sustained no lasting tangible harm to its property that could not be remedied by cleaning, the Sixth Circuit found that the losses were purely economic and were not covered under the insurance policy. Universal, 465 F. App'x at 573.

In recent months, hundreds of opinions have analyzed whether property insurance policies similar or identical to the policy at issue here extend coverage to business income lost by virtue of pandemic-related closures and restrictions. The overwhelming tide of courts across the nation have answered the question in the negative. Finding that "physical" loss or damage requires tangible or concrete harm to property causing an alteration in appearance, shape, color or in other material dimension, these courts, including Michigan federal courts, have held that neither COVID-19 nor the civil orders limiting business operations meet this physicality requirement.[3]

---

[3] See, e.g., Brown Jug, 2021 WL 2163604, at *4; St. Julian, 2021 WL 1049875, at *3; Kirsch v. Aspen Am. Ins. Co., No. 20-11930, 2020 WL 7338570 (E.D. Mich. Dec. 14, 2020); Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co., 484 F. Supp. 3d 492, 494 (E.D. Mich. 2020); see also L & J Mattson's Co. v. Cincinnati Ins. Co., No. 20 C 7784, 2021 WL 1688153, at *5 (N.D. Ill. Apr. 29, 2021); Rye Ridge Corp. v. Cincinnati Ins. Co., No. 20 Civ. 7132, 2021 WL 1600475, at *2 (S.D.N.Y. Apr. 23, 2021); B Street Grill & Bar LLC v. Cincinnati Ins. Co., No. CV-20-01326, 2021 WL 857361, at *5 (D. Ariz. Mar. 8, 2021); Circus Circus LV, LP v. AIG Specialty Ins. Co., No. 2:20-cv-01240, 2021 WL 769660, at *3–4 (D. Nev. Feb. 26, 2021); Café La Trova LLC v. Aspen Specialty Ins. Co., No. 20-22055, 2021 WL 602585, at *7–8 (S.D. Fla. Feb. 16, 2021); Colgan v. Sentinel Ins. Co., Ltd., No. 20-cv-04780, 2021 WL472964, at *3 (N.D. Cal. Jan. 27, 2021); 1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., No. 2:20-cv-862, 2021 WL 147139, at *6

7

Many courts holding that a claimant must show tangible harm to property have reasoned that this interpretation comports with the plain meaning of "direct physical loss." For instance, a court within this district evaluated the plain meaning of the phrase "direct physical loss to property," finding that the term "physical," defined in the dictionary as "having material existence," modified the term "loss" which was defined as "destruction, ruin," or "the act of losing possession." Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co., 484 F. Supp. 3d 492, 500–501 (E.D. Mich. 2020) (punctuation modified).[4] Were "physical loss" to encompass loss of use or functionality, the court determined that the term "physical" would be rendered meaningless. Id. at 501 n.9; see also Kirsch v. Aspen Am. Ins. Co., No. 20-11930, 2020 WL 7338570, at *5 (E.D. Mich. Dec. 14, 2020) (adopting Turek's reasoning in interpreting a policy providing coverage for suspension of business operations "caused by direct physical damage," where "damage" was defined as "partial or total loss of or damage to . . . covered property").

Similar rationales have been applied where courts construed policies identical to the one at issue here. See Dukes Clothing, LLC v. Cincinnati Ins. Co., No. 7:20-cv-860, 2021 WL 1791488, at *4 (N.D. Ala. May 5, 2021) ("[W]ithin the context of this policy, both loss and damage to property must be 'physical,' which is defined as 'of or relating to matter or the material world; natural; tangible, concrete.'"); Sandy Point Dental, PC v. Cincinnati Ins. Co., 488 F. Supp. 3d 690, 693 (N.D. Ill. 2020) ("The words 'direct' and 'physical,' which modify the word 'loss,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure

---

(W.D. Pa. Jan. 15, 2021); T & E Chicago LLC v. Cincinnati Ins. Co., 501 F. Supp. 3d 647, 652 (N.D. Ill. 2020).

[4] Chelsea correctly notes that the court concluded in Turek that coverage was negated under an exclusion for losses that would not have occurred but for a virus, bacteria, or microorganism. Resp. at 24 (citing Turek, 484 F. Supp. 3d at 504). However, the virus exclusion served as an alternative basis for dismissal; the court independently concluded that the plaintiff failed to establish a physical loss. Turek, 484 F. Supp. 3d at 502.

of the premises for reasons extraneous to the premises themselves, or adverse business consequences that flow from such closure.").

To be sure, other courts have reasoned that an interpretation that requires tangible harm conflates "physical loss" with "physical damage," thereby rendering those phrases redundant. See Derek Scott Williams PLLC v. Cincinnati Ins. Co., No. 20 C 2806, 2021 WL 767617, at *3 (N.D. Ill. Feb. 28, 2021); Studio 417, Inc. v. Cincinnati Ins. Co., 478 F. Supp. 3d 794, 801 (W.D. Mo. 2020); N. States Deli, LLC v. Cincinnati Ins. Co., No. 20-cvs-02569, at 7 (N.C. Super. Ct. Oct. 9, 2020) (Dkt. 18-3)). But this is a minority view. Most courts have held that "loss" and "damage" are distinguishable concepts even if they require tangible alteration to property, as "[t]he ordinary usage of these terms . . . can only be reasonably construed as extending to events that impact the physical premises completely (loss) or partially (damage)." 1 S.A.N.T., 2021 WL 147139, at *5; see also L & J Mattson's Co. v. Cincinnati Ins. Co., No. 20 C 7784, 2021 WL 1688153, at *6 (N.D. Ill. Apr. 29, 2021); Equity Planning Corp. v. Westfield Ins. Co., No. 1:20-CV-01204, 2021 WL 766802, at *11 (N.D. Ohio Feb. 26, 2021).

Applying the "tangible harm" interpretation to the present action, Chelsea has failed to plausibly allege that the civil orders caused physical loss or damage to its property. Chelsea does not contend that the civil orders had a tangible impact on its property—only that they resulted in a temporary loss of use, an argument addressed in the next section. See SAC ¶¶ 65–77. In any event, courts have held that government orders limiting operations, at most, cause limited loss of use rather than tangible harm to property. See, e.g., Dukes, 2021 WL 1791488, at *4; Kirsch, 2020 WL 7338570, at *6.

Nor has Chelsea plausibly alleged that COVID-19 caused physical loss or damage to its property. Though not expressly argued in its responsive briefing, Chelsea alleges in its complaint

9

that COVID-19 physically impacted its property. Specifically, Chelsea alleges that the COVID-19 virus can linger in the air and survive on surfaces for several hours to several weeks and that the virus caused physical alteration to Chelsea's property by adhering to objects and surfaces at the restaurant. SAC ¶¶ 23–40, 48, 52–58. Chelsea further alleges that it has sustained losses as a result of this physical damage, including the loss of use of its restaurant, the costs of cleaning and disinfecting its property, and the costs of remodeling and reconfiguring physical spaces. Id. ¶¶ 60–61.

Contrary to Chelsea's argument, "[t]he mere presence of the virus on the physical structure of the premises does not amount to direct physical loss," as "coronavirus does not physically alter the appearance, shape, color, structure, or other material dimension of the property." See Café La Trova LLC v. Aspen Specialty Ins. Co., No. 20-22055, 2021 WL 602585, at *8 (S.D. Fla. Feb. 16, 2021). The complaint acknowledges that the virus has no lasting physical impact—rather, it is ephemeral and dissipates within a span of hours to weeks. See Circus Circus LV, LP v. AIG Specialty Ins. Co., No. 2:20-cv-01240, 2021 WL 769660, at *4 (D. Nev. Feb. 26, 2021) (rejecting plaintiff's theory that physical alteration occurred when objects and surfaces were contaminated by COVID-19, as the pleadings alleged that contamination is only detectable on surfaces for days). Moreover, the virus may be eliminated simply by cleaning and disinfecting surfaces. See, e.g., L & J Matson's, 2021 WL 1688153, at *5 (holding that the alleged presence of COVID-19 in the air and on surfaces would not result in physical damage to property because no repairs or replacements were necessary—only cleaning); B Street Grill & Bar LLC v. Cincinnati Ins. Co., No. CV-20-01326, 2021 WL 857361, at *5 (D. Ariz. Mar. 8, 2021) ("The mere fact that Plaintiffs needed to clean surfaces that could host the virus does not constitute actual physical damage entitling them to coverage under the policy."); Café La Trova, 2021 WL 602585, at *9 ("[T]he use of cleaning

10

products on covered property does not constitute actual harm, as required for coverage . . . ."). The Sixth Circuit has conclusively stated, "We do not believe that the Michigan courts would find basic cleaning to constitute physical loss or damage." Universal, 475 F. App'x at 574 n.8; see also Mama Jo's Inc. v. Sparta Ins. Co., 823 F. App'x 868, 879 (11th Cir. 2020) (finding that coverage did not apply to dust caused by road construction because an item or structure that merely needs to be cleaned has not suffered a "direct physical loss").

This analysis further comports with policy language limiting coverage to business income lost during a "period of restoration," which in this case begins at the time of the loss and ends on the earlier of "[t]he date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "[t]he date when business is resumed at a new permanent location." Policy at PageID.2003. Chelsea has not alleged that the presence of the virus required it to move to a new permanent location, but it has alleged that it cleaned and disinfected its property, as well as remodeled and reconfigured physical spaces. SAC ¶¶ 60–61. In cases involving similar policy language, however, courts have held that cleaning, rearranging furniture, or installing partitions cannot reasonably be considered repairing, rebuilding, or replacing. See Dukes, 2021 WL 1791488, at *4; L & J Mattson's, 2021 WL 1688153, at *6 n.3; Café La Trova, 2021 WL 602585, at *9.[5] Consequently, Chelsea has not plausibly alleged that it engaged in a "period of restoration."

---

[5] In Derek Scott, the court rejected the argument that interpreting "physical loss" as requiring tangible harm was consistent with the provision defining a "period of restoration." 2021 WL 767617, at *4. The court reasoned that the term "repair" is not "inherently physical; one need only consider common references to repairing a relationship or repairing one's health." Id. As noted by another court, however, this strained interpretation "contort[s] these provisions far beyond their ordinary meaning." Tria WS LLC v. Am. Auto. Ins. Co., No. 20-4159, 2021 WL1193370, at *7 n.5 (E.D. Pa. Mar. 30, 2021).

Therefore, Chelsea has failed to plausibly allege physical loss or physical damage stemming from COVID-19 or the civil orders that meets the "tangible harm" interpretation.

**2. Loss of Use**

As touched on above, another line of cases has held that intangible sources such as bacteria, odor, smoke, or noxious gases may cause physical loss or damage where insured property has been rendered uninhabitable or substantially unusable for its intended purpose. See, e.g., Port Authority of New York & New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 236 (3d Cir. 2002) (establishing a "higher threshold" for coverage for asbestos contamination and other sources of contamination unnoticeable to the naked eye); Or. Shakespeare Festival Assoc. v. Great Am. Ins. Co., No. 1:15-cv-01932, 2016 WL 3267247, at *4 (D. Or. June 7, 2016), vacated by stipulation of parties 2017 WL 1034203 (D. Or. Mar. 6, 2017) (finding that coverage applied where smoke, soot, and ash produced by a wildfire accumulated on an open-air theater's plastic seating, HVAC system, lighting, and electronic systems, causing the theater to close for several days); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12–cv–04418, 2014 WL 6675934, at *3 (D.N.J. Nov. 25, 2014) (holding that coverage applied where an accidental release of toxic ammonia into a packaging facility caused the facility to become uninhabitable and unusable for one week while the ammonia dissipated and an outside company washed down surfaces).

A minority of COVID-19-related insurance cases have followed this line of authority in holding that "direct physical loss" could plausibly encompass a loss of use resulting from pandemic-related business closures. Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., No. 2:20-cv-265, 2020 WL 7249624, at *10 (E.D. Va. Dec. 9, 2020); Studio 417, 478 F. Supp. 3d at 800–801, 803 n.6. Several other cases cited by Chelsea have held that the ordinary meaning of "physical loss" is broad enough to enable a reasonable factfinder to determine that the language

encompasses a loss of use of business premises caused by COVID-19. Derek Scott, 2021 WL 767617, at *4 ("[A] reasonable factfinder could find that the term 'physical loss' is broad enough to cover . . . a deprivation of the use of its business premises."); Salon XL Color & Design Group, LLC v. W. Bend Mut. Ins. Co., No. 20-11719, 2021 WL 391418, at *2 (E.D. Mich. Feb. 4, 2021) (holding that, where the plaintiff alleged that it was unable to use its property for its intended purpose due to COVID-19, "[t]his is enough to survive a motion to dismiss when the Policy states that it will cover 'direct physical loss or damage' that does not define 'loss' or 'damage' to exclude loss of use"); N. States Deli, at 5–6 ("[T]he ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world . . . .").

This Court disagrees with the conclusion that COVID-19 rendered Chelsea's property uninhabitable or substantially unusable for its intended purpose. Assuming that the virus was present at the premises and contaminated surfaces and the air, this did not impact the functionality of Chelsea's property. Tables, chairs, kitchen equipment, and the building itself remained functional as such, as any contamination could be removed simply by disinfecting surfaces. And Chelsea has not alleged—as was the case in Oregon Shakespeare or Gregory Packaging—that a toxic substance prevented its staff members from entering the building to perform their duties. The Court agrees with Cincinnati's assessment that the presence of COVID-19 at the premises is analogous to the presence of virus particles causing influenza or the common cold. See Reply at 5 n.10 (Dkt. 19). Though each virus can be harmful and potentially deadly, no reasonable person would assert that their presence renders property uninhabitable or substantially unusable.

Nor does Chelsea plausibly allege that the civil orders limiting business operations rendered its property substantially unusable. In the complaint, Chelsea specifically takes issue with Executive Orders 2020-04, 2020-09, and 2020-21. SAC ¶¶ 65–67. Although Executive

13

Order 2020-09 closed restaurants and other places of public accommodation to "ingress, egress, use, and occupancy by members of the public" for on-site dining, it did not prohibit restaurants from operating.[6] In fact, the order expressly permitted access by employees and encouraged restaurants to "offer food and beverage using delivery service, window service, walk-up service, drive-through service, or drive- up service[.]" And while Executive Order 2020-21 directed Michigan residents to remain in their homes, it also permitted residents to leave their homes to purchase groceries and take-out food.[7] Subsequent orders enacted by DHHS limited indoor dining services but did not prevent delivery or pickup services.[8] Accordingly, the civil orders did not render Chelsea's property substantially unusable for business purposes. See St. Julian, 2021 WL 1049875, at *4 n.4 (holding that the plaintiff failed to plausibly allege that the virus or the civil orders rendered its property substantially unusable, as it was able to continue business by selling wine online and offering curbside pickup); ATCM Optical, Inc. v. Twin City Fire Ins. Co., No. 20-4238, 2021 WL 131282, at *5 (E.D. Pa. Jan. 14, 2021) (holding that a complaint alleging that an optician's office was permitted to remain open for emergency procedures failed to allege conditions that "completely or near completely precluded operation of the premises as intended") (punctuation modified).

---

[6] Office of the Governor, Executive Order 2020-09: Temporary restrictions on the use of places of public accommodation, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-521789--,00.html [https://perma.cc/E26L-U2RZ].

[7] Office of the Governor, Executive Order 2020-21: Temporary requirement to suspend activities that are not necessary to sustain or protect life, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html [https://perma.cc/3URY-6JDX].

[8] See, e.g., Gathering Prohibition and Face Covering Order (Oct. 9, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-541962--,00.html [https://perma.cc/XYL5-NU7Q]; Gatherings and Face Mask Order (Nov. 15, 2020), https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-545136--,00.html [https://perma.cc/X94A-V23Y].

The Court, therefore, concludes that Chelsea has failed to plausibly allege physical loss or physical damage based on a loss of use of its business premises as a result of COVID-19 or the civil orders. Because Chelsea has not plausibly alleged physical loss or physical damage as required under the policy, it is not entitled to coverage for business income or extra expense, and those claims must be dismissed.

**B. Civil Authority**

Chelsea also claims that it is entitled to coverage under the policy's civil authority provision. Resp. at 21. Coverage for business income and extra expense is expanded under a civil authority provision:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by a civil authority as a result of the damage; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Policy at PageID.1984.

Under this language, civil authority coverage applies only if there is a covered cause of loss that causes damage to property other than the insured's property, meaning physical loss or damage to property other than Chelsea's property. See Sandy Point, 488 F. Supp. 3d at 694. Two additional requirements must be met before coverage applies: (i) the civil authority order prohibits access to the insured's premises and (ii) the civil authority order is taken in response to dangerous physical conditions resulting from the damage. Id.; B Street Grill, 2021 WL 857361, at *6.

15

Chelsea is unable to meet these requirements. Chelsea contends that COVID-19 caused physical loss or damage to other property in the same manner as it caused physical loss or damage to its own property. Resp. at 21–22; SAC ¶¶ 51, 75, 78. But just as Chelsea was unable to establish that it sustained physical loss or damage to its property, the complaint fails to plausibly allege physical loss or damage to other property as a result of COVID-19. Further, as discussed above, though the civil orders issued by the Governor and DHHS limited Chelsea's operations, none prohibited access to Chelsea's property. See, e.g., B Street Grill, 2021 WL 857361, at *6 (finding that the complaint did not allege that access to the insured premises was prohibited, as a civil order merely prohibited on-site dining); Café La Trova, 2021 WL 602585, at *10 (finding that the complaint did not allege that access to the insured premises was prohibited, as the civil orders expressly permitted restaurants to remain open to offer food for delivery or pick-up); Kirsch, 2020 WL 7338570, at *7 n.4 (noting that "it was not clear" that a civil order prohibited access to the dental office because the plaintiff was free to continue conducting emergency procedures); Sandy Point, 488 F. Supp. 3d at 694 (holding that because the plaintiff's dental offices were permitted to perform emergency and non-elective work, the plaintiff failed to allege that access to its premises was prohibited by government order).

Chelsea contends that the Michigan Court of Appeals held in Sloan v. Phoenix of Hartford Ins. Co., 207 N.W.2d 434 (Mich. Ct. App. 1973) and Southlanes Bowl, Inc. v. Lumbermen's Mut. Ins. Co., 208 N.W.2d 569 (Mich. Ct. App. 1973), that "civil authority coverage does not require structural alteration of property when, as here, the policies do not specify any such requirement." Resp. at 22. This argument is without merit. Decided in the context of widespread looting, arson, and other destruction of property in the City of Detroit in 1967 and 1968, Sloan and Southlanes addressed only whether there was business interruption coverage for losses caused by civil

16

authority orders when there was no damage to the insured's own property. Southlanes, 208 N.W.2d at 570; Sloan, 207 N.W.2d at 436–437. They did not address what kind of damage to the property of others was required to trigger coverage.

Chelsea also contends that Studio 417 held that civil authority coverage applied because the plaintiffs had plausibly alleged that access to their properties was restricted to such a degree as to trigger civil authority coverage. Resp. at 23. Studio 417 did indeed hold that the plaintiffs adequately alleged that their access was prohibited where hair salons were required to suspend all operations and restaurants were precluded from offering indoor seating to customers. 478 F. Supp. 3d at 803–804. Again, this case is an outlier. Most courts have determined, even outside the COVID-19 context, that "reduction to partial access does not suffice to trigger business income coverage under the Civil Authority provisions." 1 S.A.N.T., 2021 WL 147139, at *7 (collecting cases). Thus, civil orders permitting restaurants to remain open for takeout and delivery services do not "prohibit access" to those premises, as necessary for civil authority coverage to apply. Id.

This majority view is more consistent with the ordinary meaning of the terms "prohibit" and "access," which are not defined by the policy. "Prohibit" is defined in a leading dictionary as "to forbid by authority," while "access" is defined as "permission, liberty, or ability to enter, approach, or pass to and from a place" or "freedom or ability to obtain or make use of something."[9] The civil orders plainly did not forbid Chelsea from entering or making use of the insured premises. Adopting Chelsea's interpretation would impermissibly rewrite the policy by substituting the phrase "restricts access to the 'premises'" in place of "prohibits access to the 'premises.'" See Erickson v. Citizens Ins. Co., 550 N.W.2d 606, 608 (Mich. Ct. App. 1996) ("If the language of an

---

[9] Merriam-Webster, "Prohibit," https://www.merriam-webster.com/dictionary/prohibit [https://perma.cc/5MBM-SUKL]; Merriam-Webster, "Access," https://www.merriam-webster.com/dictionary/access [https://perma.cc/Z34E-TE35].

insurance contract is clear and unequivocal, the court will enforce its terms and not rewrite the contract.").

Because Chelsea is unable to plausibly allege physical loss or damage to other property or that it was prohibited from accessing its own property by virtue of a civil order, the civil authority provision under the policy does not apply. Accordingly, the claims premised on the civil authority provision must be dismissed.

### C. Virus Exclusion

Though not expressly addressed in the responsive briefing, the complaint suggests that Chelsea's COVID-19-related losses are covered because the policy does not contain a virus exclusion. See SAC ¶¶ 92–95. Specifically, the complaint notes that in 2006, the Insurance Services Office (ISO)—an organization that provides policy writing services to insurers—"announced the submission of an 'exclusion of loss due to disease-causing agents such as viruses and bacteria.'" Id. ¶ 92 (quoting ISO Circular at 1 (Dkt. 13-2)). Chelsea further alleges that, despite the availability of a specific exclusion for virus-related losses, the policy at issue here does not contain such an exclusion. Id. ¶ 95.

This argument lacks merit. Michigan law provides that courts must first determine if the policy provides coverage to the insured; if it does, only then do courts "ascertain whether that coverage is negated by an exclusion." Heniser v. Frankenmuth Mut. Ins. Co., 534 N.W.2d 502, 510 (Mich. 1995). Thus, a policy's exclusionary provisions cannot be used to establish coverage in the first instance. See Hassanein v. Encompass Indem. Co., No. 347544, 2020 WL 5495210, at *9 (Mich. Ct. App. Sept. 10, 2020) (citing Heniser, 534 N.W.2d at 510); see also St. Julian, 2021 WL 1049875, at *4; Café La Trova, 2021 WL 602585, at *6 n.7. Because Chelsea has not shown

18

that it is entitled to coverage in the first instance under the business income, extra expense, or civil authority provisions, the absence of a virus exclusion is immaterial.

### D. Supplemental Authority

Cincinnati has filed a motion for leave to file supplemental authority. Whether to permit parties to file notices of supplemental authority is a matter left to the Court's discretion. Brintley v. Belle River Cmty. Credit Union, No. 17-13915, 2018 WL 8815627, at *1 (E.D. Mich. May 7, 2018). Because Cincinnati's motion simply offers additional authority relevant to the Court's decision and does not advance any legal argument, the Court grants Cincinnati's motion for leave to file supplemental authorities.

## IV. CONCLUSION

For the reasons stated above, Chelsea has not plausibly alleged that Cincinnati breached the terms of the policy by improperly denying Chelsea's claim. Accordingly, all of its claims must be dismissed. Cincinnati's motion to dismiss (Dkt. 15) and its motion for leave to file supplemental authority (Dkt. 25) are both granted.

SO ORDERED.

Dated: June 21, 2021　　　　　　　　　　　　　s/Mark A. Goldsmith
　Detroit, Michigan　　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge